1
2
3
4
5
6          **UNITED STATES DISTRICT COURT**
7          **EASTERN DISTRICT OF CALIFORNIA**
8
9   UNITED STATES OF AMERICA,      )    1:07-cr-0151 OWW
                                   )
10              Plaintiff,         )    MEMORANDUM DECISION AND
                                   )    ORDER RE: DEFENDANT'S
11       v.                        )    MOTION TO SUPPRESS EVIDENCE
                                   )
12  JOHN McCARTNEY,                )
                                   )
13              Defendant.         )
                                   )
14  _____ )
15
16       Before the Court is Defendant's Motion to Suppress the
17  seizure of a machine gun from his vehicle on May 23, 2007, at
18  approximately 1:00 a.m. in Bakersfield, California, and the
19  subsequent search of his residence pursuant to a search warrant,
20  both as unlawful and in violation of the Fourth Amendment.
21
22                          **THE FACTS**
23       Evidentiary hearings were held January 11, 2008, and March
24  7, 2008.  Agent Howard Sanders, Special Agent for the Bureau of
25  Alcohol, Tobacco & Firearms since 1983, testified that on May 23,
26  2007, he received a call from a confidential informant, the
27  mother of one of the Defendant's children, with whom the Agent
28  had been working for over a year and had talked to over twenty

                              **1**

1   times.   Agent Sanders was advised on May 23 by the informant that
2   the Defendant, John McCartney, was then in possession of a
3   machine gun which had been placed in the Defendant's white pick-
4   up truck at the informant's home.

5        Agent Sanders responded to the area of the residence to
6   establish surveillance.   The Agent observed a white Ford pick-up
7   truck and parked down the block.   The Agent learned that he had
8   established surveillance on the wrong vehicle when he received
9   word that the Defendant's vehicle had moved.

10        Agent Sanders then spoke with the informant who told him
11   that the truck had left her residence to go to the Winco
12   Supermarket.   Agent Sanders traveled to the Winco Supermarket in
13   Bakersfield, California, and saw the white Ford pick-up truck.
14   Agent Sanders set up surveillance and waited for the vehicle to
15   leave.   At that time Agent Sanders contacted the Kern County
16   Sheriff's Office and spoke with a watch commander.   Agent Sanders
17   told the watch commander that the Defendant was in the area, that
18   Defendant had a machine gun with him and that the Defendant would
19   be traveling later to the Defendant's residence.

20        Agent Sanders then spoke directly with Kern County Deputy
21   Avery Simpson and asked Deputy Simpson to establish surveillance
22   and to be prepared for Defendant's vehicle to move.

23        Agent Sanders told Deputy Simpson that Agent Sanders had
24   information from the confidential informant that there was a
25   machine gun in Defendant's vehicle and that the Defendant would
26   be traveling out of the area.   As Agent Sanders observed
27   Defendant leave the parking lot in Defendant's truck, the Agent
28   called Deputy Simpson and advised as to the direction the vehicle

1 | was traveling.

2 |     The Agent did not follow immediately and next made contact
3 | after Deputy Simpson had effectuated a traffic stop and taken
4 | Defendant into custody.

5 |     Later the same morning, Agent Sanders performed a field test
6 | examining the firearm without firing it, by operating the trigger
7 | mechanism, and determined that it functioned as a fully automatic
8 | machine gun.

9 |     Agent Sanders then applied for a search warrant for the
10 | Defendant's residence based, in part, on the traffic stop and the
11 | machine gun found in Defendant's car and additional information
12 | acquired from the cumulative four year investigation of
13 | Defendant.  Agent Sanders testified that based on the ongoing
14 | investigation of Defendant, Sanders would have sought the search
15 | warrant even without receiving information about the seized
16 | machine gun from the informant and the seized machine gun.

17 |     Defendant established, in cross-examination, that the
18 | informant is an individual who is the mother of one of the
19 | Defendant's children, who was present at her residence with the
20 | Defendant before she telephoned Agent Sanders.  Agent Sanders has
21 | known the confidential informant since August of 2006 and was not
22 | aware that there was a dispute between the informant and
23 | Defendant over child custody.  Agent Sanders understood that the
24 | informant had custody of the child.

25 |     Agent Sanders had been investigating the Defendant since
26 | August of 2006.  Other ATF Agents had been investigating the
27 | Defendant since October of 2003.  No previous search warrant was
28 | sought, because the investigation had closed when the prior case

3

1  agent transferred out of the Bakersfield ATF office.  Agent

2  Sanders believed that information about the Defendant's

3  activities from 2003 and 2004 was still relevant.

4       Agent Sanders had talked to the informant between 12 and 24

5  times before the May 23, 2007, search.  Agent Sanders had never

6  verified any information provided by the informant by actually

7  observing weapons.

8       Agent Sanders stated that information provided to him by the

9  informant was corroborated by other sources of information and by

10 Agent Sanders' observations at the Defendant's residence which

11 confirmed certain things the informant described.  The

12 information provided by the informant, that was cross-

13 corroborated by other sources, and the Agent's direct

14 observations, included that the Defendant held anti-government

15 beliefs, that he was heavily armed, including with machine guns,

16 explosives, and silencers.  This information was told to Agent

17 Scott before August 2006, who provided the information to Agent

18 Sanders.  Agent Sanders had actually observed silencers in

19 Defendant's possession.  Three other informants described

20 Defendant as associated with a militia group that held anti-

21 government opinions and believed in being armed and prepared for

22 either the U.S. government or a foreign government conducting

23 some type of activity against their interests or against their

24 personal rights.  Some of the confidential informants were

25 reported as being part of the group.

26      Kern County Sheriff's Deputy Simpson testified that he was

27 on duty May 23, at approximately 1:00 a.m., in uniform, in a

28 marked vehicle.  Deputy Simpson received a message that ATF

1  Agents were in his zone conducting surveillance on a residence.

2  Pursuant to the message, Deputy Simpson called Agent Sanders, who

3  then told Deputy Simpson that Agent Sanders had a confidential

4  informant who told Sanders that Defendant had a machine gun in

5  his vehicle and the Agent would get back to Deputy Simpson.

6  Shortly after, Agent Sanders told Deputy Simpson he had Mr.

7  McCartney under surveillance at the Winco Shopping Center on

8  Coffee Road in Bakersfield, California.

9  Agent Sanders reported to Deputy Simpson that Defendant was

10  moving again in his vehicle out of the parking lot and that Agent

11  Sanders would like Deputy Simpson "to find some probable cause to

12  stop the vehicle."

13  A short time later, Agent Sanders called Deputy Simpson and

14  told Deputy Simpson the vehicle was moving.  Deputy Simpson moved

15  behind the vehicle and followed it for a short time because Agent

16  Sanders wanted Deputy Simpson to get Defendant's vehicle out of

17  the area.

18  Deputy Simpson was traveling eastbound on Hageman Street

19  approaching the red light at Fruitvale Avenue where he observed

20  Defendant slowing for the red light.  Deputy Simpson noticed that

21  Defendant's truck's left brake light was inoperable.  Defendant's

22  left brake light did not illuminate at all, like the right one on

23  the right-hand side of the truck when Defendant applied his

24  brake.

25  Deputy Simpson conducted a traffic stop by activating his

26  solid red light.  Defendant yielded a short time later.  Deputy

27  Simpson made contact with Mr. McCartney and explained why

28  Defendant was stopped.  Deputy Simpson asked for Defendant's

1 vehicle registration and proof of insurance.  Defendant looked
2 around in the vehicle for a time and then told Deputy Simpson
3 that Defendant did not have registration or proof of insurance.
4 The vehicle had dealer plates, no actual license plates.  Deputy
5 Simpson then conducted a records check using the Vehicle
6 Identification Number and confirmed that the vehicle's
7 registration had been expired more than six months, since January
8 of 2006.

9     Deputy Simpson ordered Defendant to exit the vehicle and
10 advised Defendant he was being detained pending a traffic
11 citation.  Defendant was told that Deputy Simpson was going to
12 have to tow Defendant's vehicle.  Deputy Simpson asked Defendant
13 if there was anything illegal in the vehicle.  Defendant said
14 there was not and "it didn't matter anyway."  Deputy Simpson
15 conducted an impound inventory of the vehicle for the tow and
16 located a machine gun in several different pieces in two bags in
17 the vehicle.

18     Deputy Simpson is a sworn peace officer in the State of
19 California and towed and stored the vehicle pursuant to his
20 discretion expressly provided by California Vehicle Code
21 § 22651(o)(1).  Pursuant to the Kern County Sheriff's
22 Department's then-existing policy and procedures, an impound
23 form, Exhibit 1 in evidence, is utilized whenever the Kern County
24 Sheriff's Department tows or recovers a vehicle.  An inventory of
25 the contents of the vehicle and a record of whatever property is
26 found in the vehicle must be made.

27     The form is then turned in to the Sheriff's Department and
28 the record is mailed to the legal owner and registered owner of

**6**

1  the vehicle.   Deputy Simpson completed the form and complied with
2  the mailing procedure.

3      The actual inventory and contents of Defendant's vehicle is
4  described in Exhibit 2 in evidence.   Exhibit 2 is a Kern County
5  Sheriff's Department Vehicle Recovery and Storage Report.   The
6  vehicle was then impounded at Golden Empire Towing until it was
7  picked up from the impound facility on June 21, 2007.

8      After inventory of the vehicle, Mr. McCartney was placed
9  under arrest.   Another Deputy was present throughout the traffic
10 stop and search of the vehicle.   Deputy Simpson identified
11 Defendant as the individual whose vehicle he stopped and whose
12 vehicle from which the firearm was recovered.   At the time of the
13 stop when Mr. McCartney pulled over, Deputy Simpson and another
14 patrol car were in the vicinity of Defendant's vehicle.   Neither
15 party called as a witness the other Deputy who was in a separate
16 vehicle.   Deputy Simpson testified that the left rear taillight
17 on the truck did not illuminate or "did not shine;" "that light
18 didn't show."   Deputy Simpson stated that is the reason why he
19 pulled the vehicle over, the probable cause he found to pull the
20 vehicle over.

21     Deputy Simpson found the machine gun in several pieces in
22 the back floorboard.   Parts of the machine gun were in a duffle
23 bag, part in a laundry bag.   The machine gun was found during the
24 inventory search.   In the parking lot, Agent Sanders and Deputy
25 Simpson "field-tested" the machine gun by working the trigger
26 mechanism and found it to be fully automatic.   Deputy Simpson
27 testified that "you don't have to actually fire the weapon to
28 field-test it."

1    The vehicle was impounded by Golden Empire Storage, where it

2  was taken from the arrest scene on May 23, 2007, until it was

3  picked up by the Defendant's son, Josh McCartney, on June 21,

4  2007.  Golden Empire Towing is a Kern County Sheriff's

5  Department-approved towing and storage facility.  Deputy Simpson

6  had no role in approving the pick-up of the vehicle, however, he

7  stated some officer from the Sheriff's Department had to approve

8  picking up the vehicle.  Deputy Simpson had no knowledge about

9  who picked up the vehicle as he was not present.

10    The defense presented the testimony of Manuel Vasile, a

11  Federal Defender's investigator employed in June of 2007 in the

12  Eastern District of California at Fresno.

13    Mr. Vasile went to Golden Empire Towing in June, 2007 where

14  he videotaped the taillights of the vehicle.  The videotape

15  revealed that the left rear taillight was then fully covered with

16  masking tape and that when the brakes of the truck were applied,

17  both taillights illuminated each time.  The video showed that

18  tape completely covered the left rear taillight.  The video was

19  made June 22, 2007.  Mr. Vasile had no knowledge about the

20  assembly of the rear taillight or its function.

21    Joshua McCartney, the son of the Defendant, testified that

22  he was with Mr. Vasile on June 22, 2007, when the taillights on

23  Defendant's truck were tested.  Joshua McCartney stated that the

24  taillight on the left side was damaged when he was driving the

25  truck and the tailgate came off on one side, swung, and broke the

26  red glass lens on the left taillight.  Joshua McCartney testified

27  that on the day Defendant was arrested, he saw the left

28  taillight, that it "seemed to be operable and had tape covering

**8**

1   it."   The tape covered the whole brake light area.

2       Josh McCartney stated that everything seemed to be fine with

3   the taillight with the exception of the red lens, which was

4   missing.   After Josh McCartney picked the truck up, he took the

5   "whole taillight assembly out and replaced it."

6       At a subsequent hearing, the government called Peter Fina, a

7   master Ford-trained mechanic, who testified that he was familiar

8   with the Ford F150 taillight assembly and its operation, repair,

9   and replacement.   Mr. Fina testified that an entire taillight

10  assembly does not need to be replaced for a broken lens.   The

11  lens can be replaced separately, as can a light bulb, if the bulb

12  is not operating.

13      Deputy Simpson did not describe the taillight nor did he

14  examine the taillight at the scene of the arrest.   He did not

15  state whether or not he observed masking tape on the taillight,

16  nor was he asked to describe the taillight as he observed it at

17  the stop.   The second Deputy who was in a separate vehicle and

18  present when Deputy Simpson made the arrest was not called to

19  testify about whether he observed the left taillight in

20  operation.   The testimony of the investigator and Defendant's son

21  raise substantial question about whether the taillight was

22  illuminating the evening of May 23, 2007.   Deputy Simpson

23  testified the inoperative taillight provided primary probable

24  cause for the vehicle stop.

25      No explanation was offered for why the Defendant did not

26  contact the government about the physical test of the taillight

27  in June of 2007, and did not invite inspection and testing of the

28  taillight before it was irrevocably modified by replacing the

1   entire taillight assembly.  According to the government's expert,

2   it was unnecessary to replace the whole assembly, if all that was

3   required to be replaced was a broken lens.  There is nothing

4   privileged, nor strategically advantageous to prevent timely

5   disclosure for inspection and testing of important physical

6   evidence that calls into question the efficacy of a basis for

7   probable cause.

8       Here, Joshua McCartney's actions with respect to the vehicle

9   made it impossible for any independent testing and corroboration

10  of the state of the wiring, the age and condition of the bulb,

11  its filament, presence of corrosion in the assembly, and the

12  overall operability of the entire taillight assembly.  It is

13  impossible to know whether the filament in the taillight bulb was

14  loose, whether wiring was loose or shorting, whether corrosion or

15  other adverse condition prevented the taillight from operating or

16  caused the taillight to operate intermittently.  The replacement

17  of and failure to retain the entire taillight assembly prevented

18  verification of whether both versions of the facts, including the

19  Deputy's observation at the time of the arrest, and the

20  investigator's observation a month later at the storage yard,

21  were consistent or inconsistent.

22      When the Deputy stopped the Defendant and asked Defendant to

23  produce license and registration, Defendant had no vehicle

24  registration in his possession, as required by law.  An immediate

25  check of DMV records showed that Defendant's registration for the

26  truck had expired more than a year earlier.  There is no dispute

27  that the Officer, pursuant to the California Penal Code, had the

28  authority and discretion to impound and inventory the vehicle and

**10**

1  its contents.  The government has not argued inevitable

2  discovery, except as it relates to the inventory search of the

3  impounded vehicle in connection with the arrest of the Defendant.

4

5                          **LAW AND ANALYSIS**

6  A.    **STANDING**

7       The government questions whether Defendant has standing to

8  challenge the search of his vehicle and residence and the

9  seizures of the machine gun from the vehicle and other evidence

10  from the residence.  To establish standing, a person claiming a

11  Fourth Amendment violation must demonstrate a legitimate

12  expectation of privacy in the place to be searched or the thing

13  seized.  *United States v. Gamez-Orduno*, 235 F.3d 453, 458 (9th

14  Cir. 2000).  The owner of an automobile has an expectation of

15  privacy in the vehicle and standing to object to an

16  unconstitutional search.  *United States v. Thomas*, 447 F.3d 1191,

17  1197-98 (9th Cir. 2006).

18       Here, Mr. McCartney owned the pick-up truck and was its

19  driver.  He enjoyed an expectation of privacy in the vehicle and

20  has standing to challenge an alleged unreasonable search and

21  seizure of the vehicle.

22       Mr. McCartney was the owner of the residence subject of the

23  government's search warrant and, as the owner of that real

24  property and residence, has standing to object to any unlawful

25  search and seizure, if the search warrant was obtained illegally.

26  *Agnello v. United States*, 269 U.S. 20, 33 (1925) (homeowner has

27  protectable privacy interest).

28  *///*

                                  11

1 **B.** <u>**SEARCH OF THE TRUCK**</u>

2 The Fourth Amendment's prohibition of unreasonable searches
3 and seizures extends to seizures of the person, including the
4 brief investigatory stop of a vehicle. *United States v.*
5 *Brignoni-Ponce*, 422 U.S. 873, 878 (1975). An officer may not
6 detain a motorist without "reasonable suspicion." *United States*
7 *v. Rodriguez*, 976 F.2d 592, 594 (9th Cir. 1992), amended by 997
8 F.2d 1306 (9th Cir. 1993).

9 Reasonable suspicion consists of specific, articulable facts
10 which, together with objective and reasonable inferences, form
11 the basis for suspecting that the particular person detained is
12 engaged in criminal activity." *U.S. v. Diaz-Juarez*, 29 F.3d
13 1138, 1141 (9th Cir. 2002); *Rodriguez* at p. 594. Reasonable
14 suspicion must be based on individualized suspicion of the
15 particular person to be stopped. *United States v. Montero-*
16 *Camargo*, 208 F.3d 1122, 1131-32 (9th Cir. 2000), *cert. denied*,
17 531 U.S. 889 (2000).

18 Reasonable suspicion "is formed by specific, articulable
19 facts which, together with objectionable and reasonable
20 inferences, form the basis for suspecting the person detained is
21 engaged in criminal activities." *United States v. Rojas-Millan*,
22 234 F.3d 464, 468-69 (9th Cir. 2000). The totality of the
23 circumstances is examined to determine whether the detaining
24 officer had a particular and objective basis for suspecting
25 criminal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273
26 (2000). The government has the burden to justify a warrantless
27 arrest and a warrantless intrusion on a Defendant's Fourth
28 Amendment rights. *United States v. Emens*, 649 F.3d 653, 657 n.5

1    (9th Cir. 1980).

2        The decision to stop an automobile is reasonable where the

3    police have probable cause to believe that a traffic violation

4    has occurred.  *Whren v. United States*, 517 U.S. 806, 810 (1996).

5    In effecting a vehicle stop, an officer may rely on training and

6    experience to draw inferences from facts observed; those

7    inferences must be grounded in objective facts and capable of

8    rational explanation.  *United States v. Mariscal*, 285 F.3d 1127,

9    1130 (9th Cir. 2002).  A minor traffic violation can give rise to

10   a custodial arrest.  *Atwater v. City of Lago Vista*, 532 U.S. 318,

11   323 (2001) (first time seat belt offense justified arrest with

12   one hour detention at police station).

13       In this case, the collective knowledge doctrine applies.

14   *United States v. Ramirez*, 473 F.3d 1026, 1032-33 (9th Cir. 2007)

15   (court can aggregate the facts known to each officer when they

16   communicate, even if information is not actually communicated to

17   the arresting officer).  The specific and articulable facts which

18   were available to Deputy Simpson include:  (1) he observed the

19   left rear taillight of Defendant's truck did not illuminate, a

20   violation of the California Vehicle Code; (2) he had received

21   information from Agent Sanders that a confidential informant of

22   Agent Sanders' had provided current information that Defendant

23   was then in possession of a machine gun in Defendant's truck; and

24   (3) Deputy Simpson understood that Defendant was under

25   investigation for possession of illegal firearms and had been

26   asked by Agent Sanders to find probable cause to effect a traffic

27   stop of Defendant's vehicle.  A court must determine whether,

28   under the totality of the circumstances the "collective

                                    13

1  knowledge" of the investigating officers supported probable cause

2  to make the arrest.  *United States v. Del Viso*, 918 F.2d 821,

3  825-26 (9th Cir. 1990) (where there has been communication among

4  agents, probable cause can rest upon investigating agents'

5  collective knowledge).  Defendant and his truck matched the

6  description Deputy Simpson had been given.  The informant's

7  reported knowledge of Defendant's possession of the machine gun,

8  imparted to Agent Sanders, was cross-corroborated by other

9  informants who had been told about and had observed Defendant

10  with weapons on prior occasions.

11

12  C.   THE TAILLIGHT

13       Deputy Simpson testified unequivocally that the left rear

14  brake light of the vehicle did not illuminate when Defendant

15  braked to stop at a stop light at Fruivale Avenue where it

16  intersects with Hageman in Bakersfield, California around 1:00

17  a.m.  Defendant's son and an investigator, videotaped the

18  taillight approximately one month later at Golden Empire Towing,

19  where the taillight illuminated in response to pressure on the

20  brake pedal.  Although Defendant argues the "only possible

21  inference" from the evidence is that the "right brake light was

22  working," Officer Simpson's testimony establishes that the only

23  witness to the traffic stop on May 23, 2007, who testified,

24  without qualification, that the left rear brake light was not

25  operating in the street.  Defendant's witnesses testified that at

26  the towing facility one month later, the "right" rear taillight

27  operated.  *See*, Defendant's Supplemental Memorandum of Points and

28  Authorities, p. 5:1-5 (Defendant refers to the "right" rear brake

**14**

1  light).   The government's witness, Peter Fina, testified that a
2  loose or worn filament, faulty wiring, a defective or insecure
3  bulb, or corrosion in the taillight mechanism, may all cause a
4  brake light to illuminate intermittently or not at all.

5       Defendant's son, Joshua, testified that he took the entire
6  brake light assembly and replaced it after Defendant's truck was
7  retrieved from the impound facility following June 22, 2007,
8  although the son did not describe any need to replace the whole
9  assembly.   The bulb was separately replaceable, the lens that
10  Joshua McCartney claimed was broken, was separately replaceable,
11  and Joshua McCartney never stated that there was any other
12  problem with the taillight, except that the lens was broken.
13  Joshua McCartney, instead of inviting law enforcement to be
14  present at the time of the test, and instead of preserving the
15  taillight assembly so it could be examined and tested, replaced
16  the entire taillight assembly and disposed of it to make
17  impossible verification of its condition.   From these facts, the
18  Court draws the negative inference that if the taillight was
19  suffering only from a broken lens, there was no reason to replace
20  the entire assembly.   The failure to offer and permit inspection
21  and testing of the assembly calls into question the credibility
22  of Joshua McCartney's conduct.   Joshua McCartney also testified
23  that he had seen the taillight before the arrest, the day of the
24  arrest, and that it was operating.

25       No other evidence impeaches Deputy Simpson's testimony.
26  Deputy Simpson has no prior acquaintance with the Defendant, nor
27  is there any reason to question Deputy Simpson's credibility.   It
28  was not a Kern County investigation.   Defendant describes the

1   Deputy's testimony about illumination of the brake light as

2   "mistaken."  *See* P&A, p. 5:1.  The evidence provides no basis on

3   which to find Deputy Simpson incredible.  No questioning

4   specifically established that the left rear taillight was covered

5   by masking tape on May 23, 2007, at the scene of the traffic

6   stop.  No testimony was elicited from any witness about the

7   condition and appearance of the taillight as it was observed at

8   the time of the vehicle stop.

9        Deputy Simpson testified that the left taillight did not

10  illuminate when the truck came to a stop.  Given that the bulb

11  could have been activating intermittently; that wiring could have

12  been faulty; that corrosion of the housing could have affected

13  its performance as Mr. Fina testified; there are electrical-

14  mechanical reasons why a taillight would not illuminate a month

15  earlier at the scene of the stop and would illuminate at Golden

16  Empire Towing a month later.  Defendant's evidence does not

17  overcome the specific uncontradicted testimony of Deputy Simpson

18  that the left taillight did not illuminate at the time of the

19  stop, which gave him probable cause to stop the vehicle.

20       A malfunctioning brake light violates California Vehicle

21  Code § 24603(b).  This provided Deputy Simpson probable cause to

22  act lawfully when he stopped the vehicle because the vehicle's

23  left rear taillight was not properly functioning.  Deputy Simpson

24  then discovered that the vehicle lacked registration, which had

25  expired more than a year prior.  This was a separate violation of

26  California Vehicle Code § 4000.  The Defendant had no proof of

27  insurance on his person or in his vehicle and was unable to

28  produce either a current registration to the vehicle or proof of

16

1  insurance upon request by Deputy Simpson.  The failure to have

2  proof of insurance violated California Vehicle Code § 160028(a).

3      Deputy Simpson had authority to impound Defendant's vehicle

4  under California Vehicle Code § 22651(o)(1), which provides:

5              Any peace officer . . . who is engaged in directing
               traffic or enforcing the parking laws and regulations,
6              of the City, County, or jurisdiction of a State agency
               in which a vehicle is located, may remove a vehicle
7              located within the territorial limits in which the
               officer or employee may act, under any of the following
8              circumstances:

9              . . .

10             (o)(1) When any vehicle is found or operated upon a
               highway, any public lands, or an off-street parking
11             facility with a registration expiration date in excess
               of six months before the date it is found or operated
12             on the highway . . . .  However, whenever the vehicle
               is occupied, only a peace officer, as defined in
13             Chapter 4.5 (commencing with section 830) of Title 3 of
               Part 2 of the Penal Code, may remove the vehicle.
14

15     Here, Defendant's registration had been expired since

16  January of 2006, more than six months prior to the date of the

17  vehicle stop on May 23, 2007.  Deputy Simpson was a peace officer

18  engaged in directing traffic or enforcing parking laws and

19  regulations of Kern County.  Deputy Simpson was authorized to

20  remove Defendant's vehicle.

21

22  D.   <u>INVENTORY SEARCH</u>

23     When a vehicle enters police custody, law enforcement

24  officers are permitted to inventory search the vehicle and

25  inventory and impound its contents.  *South Dakota v. Opperman*,

26  428 U.S. 364, 372 (1976).  In *Opperman*, a car was impounded after

27  having twice been ticketed for being illegally parked.  Pursuant

28  to the impound procedure, the contents of the car were

17

1  inventoried during an inventory search of the vehicle.  Marijuana

2  was discovered.  The vehicle inventory search was lawful and

3  justified to protect law enforcement against unjustified claims

4  of lost or stolen property and to protect law enforcement

5  officers from possible danger.  *Opperman* at p. 369.

6      Deputy Simpson's inventory search revealed the machine gun

7  which was broken down in pieces contained in two bags.  Upon

8  assembly, Agent Sanders and Deputy Simpson field-tested the

9  machine gun, conducting a presumptive test which involved pulling

10  the trigger, and found it to operate in fully automatic mode.

11      The traffic stop for an inoperative left rear taillight was

12  lawful, Defendant's truck was lawfully impounded for his failure

13  to possess a current registration, as the truck registration had

14  expired over six months earlier, in January of 2006.  As a peace

15  officer for Kern County, Deputy Simpson had the authority to

16  inventory search the vehicle pursuant to his impound

17  authorization.  The inventory search of the vehicle was lawful.

18

19  E.   PROBABLE CAUSE THROUGH INFORMANT

20      The Deputy did not testify to his suspicion that Defendant

21  possessed a machine gun in his truck, based on the information

22  Agent Sanders provided to Deputy Simpson.  Deputy Simpson had

23  been contacted by Agent Sanders, who advised that an informant

24  had just provided information to Agent Sanders that a white Ford

25  F150 pick-up truck operated by John McCartney was at a local

26  Winco Supermarket and that Defendant had a machine gun in the

27  vehicle.

28      Agent Sanders had had more than twenty separate

1  conversations with the informant, who shared a child with the

2  Defendant.  The informant had provided prior information to Agent

3  Sanders that the Defendant was a member of a group holding anti-

4  government views that had survivalist objectives, meetings,

5  weapons, including machine guns and grenades, all of which had

6  been personally observed by the informant.  At least three other

7  individuals cross-corroborated the informant's description of the

8  Defendant's anti-government views, the group, the meetings, his

9  possession of weapons, including machine guns, and that they had

10  personally observed that Defendant possessed firearms, survival

11  gear, and assembled and/or possessed machine guns.

12      Deputy Simpson was permitted to rely on information provided

13  by the ATF Agent, who requested assistance in addressing probable

14  cause to believe Defendant possessed a machine gun in Defendant's

15  truck in the early morning of May 23, 2007.  As *Ramirez*

16  establishes, even if unarticulated, the collective knowledge of

17  law enforcement officers engaged in the same investigation can

18  provide probable cause.

19      Defendant argues that the ATF had been investigating him

20  since August of 2006 by Agent Sanders and at least three years

21  prior, by another ATF Agent named Scott.  No previous search

22  warrants or arrest warrants were sought based on the

23  investigation.  Although the four informants reported that Mr.

24  McCartney possessed a machine gun, a grenade, and silencers, no

25  direct observation of these weapons was made by the agents,

26  except through informants.

27      Defendant further argues that Agent Sanders had spoken with

28  the informant, the mother of Mr. McCartney's child, approximately

1  24 times between August of 2006 through May, 2007.  The Agent did
2  not find any weapons or other evidence of a violation of the law
3  by Defendant during that period until the tip concerning
4  possession of the machine gun on May 23, 2007.  Agent Sanders did
5  confirm by personal observation, the accuracy of the informant's
6  description of Defendant's residence and the other informants'
7  reports about the Defendant possessing weapons and a machine gun.
8  The totality of Agent Sander's and Deputy Simpson's objectively
9  reasonable belief in the accuracy of the information provided to
10 him by Agent Sanders, a Federal law enforcement officer, that
11 Defendant was in possession of a machine gun in his truck on May
12 23, 2007, provided Deputy Simpson with a duty to investigate and
13 detain Defendant relative to an articulated good faith belief in
14 the particularized suspicion that the Defendant then possessed a
15 machine gun.  This alternative ground meets the constitutional
16 minimum to justify the vehicle stop and search.

17

18 **F.   <u>THE SEARCH WARRANT FOR DEFENDANT'S RESIDENCE</u>**

19      Defendant contends that the residence search and seizure of
20 more weapons must be suppressed as "fruit of the poisonous tree,"
21 as it was the product of an unlawful search of Defendant's truck
22 and illegal seizure of the machine gun.  The government rejoins
23 that, *arguendo*, even if the vehicle search is infirm, that
24 sufficient independent probable cause exists for the search
25 warrant of the residence, after excising any reference to seizure
26 of the machine gun from the Defendant's truck, to justify the
27 search of Defendant's residence.  *United States v. Barajas-*
28 *Avalos*, 377 F.3d 1040, 1054 (9th Cir. 2004).

1    In the affidavit supporting the search warrant, Special
2    Agent Helen Dunkel averred, *inter alia*, that Defendant had been
3    under investigation since October 22, 2003.  That Defendant was a
4    member of an anti-government, right-wing extremist group
5    operating out of Caliente and Bakersfield, California.  A
6    confidential informant who had a close personal relationship with
7    Defendant believed that the Defendant had betrayed her.
8    Defendant owned the residence at 42176 Indian Oak Road, Caliente,
9    California 93518.  Defendant came into an inheritance sometime
10   before April, 2003, began stockpiling weapons, ammunition, night
11   vision goggles, and other survival supplies.  Defendant told the
12   CI that some of the firearms were machine guns.  The CI related
13   to ATF Agent Scott that Defendant ordered firearms kits through
14   the mail and told the CI that a firearm kit lacked one piece
15   needed to make the firearm into a machine gun.  That over time
16   Defendant acquired three firearm kits which were converted to
17   machine guns.

18   On an occasion following the summer of 2003, Defendant was
19   in an auto accident, called the confidential informant to pick
20   him up.  When the confidential informant picked up Defendant,
21   Defendant ran into an apple orchard, picked up a firearm and told
22   the informant that he would be arrested if the police found the
23   firearm because it was a fully automatic weapon.

24   Defendant also told the confidential informant that he
25   assembled firearms, barrels and silencers in the garage located
26   behind his residence.  The confidential informant personally
27   observed Defendant make a firearm silencer with a machine.  The
28   informant saw Defendant affix the silencer to the end of a gun

21

1   and heard muffled sounds the informant believed were two

2   gunshots.  Defendant returned to the garage and stated to the

3   informant that he needed to continue to work on the silencer

4   because it did not fit properly.

5        The confidential informant also observed a box filled with

6   hand grenade shells in Defendant's garage.  Defendant also showed

7   the informant a tubular device that looked like a pipe, about

8   which the Defendant stated, that if a detonator was attached, and

9   a car ran over it, it would explode.  A second informant stated

10  that he had seen numerous weapons at Defendant's residence, that

11  Defendant had attempted to recruit the second informant to the

12  group and that the second informant was worried about a friend

13  who Defendant was "brain washing."  A third informant observed

14  Defendant with a purchased "sten gun" kit, which Defendant

15  described as "automatic."  The third informant understood that

16  Defendant made the sten gun kit into a machine gun.  The third

17  informant also observed hand grenade shells in Defendant's garage

18  in November of 2003.

19       Defendant has no registered title to firearms in the

20  National Firearm Registration and Transfer Record.  The third

21  informant had extended discussions with Defendant about

22  Defendant's anti-government views, possession of weapons, and a

23  sabotage book.  Defendant told the third informant that it was

24  legal to possess machine guns if a $200 tax was paid on the

25  firearm.

26       A fourth informant reported that Defendant is well armed,

27  including with machine guns, silencers, large caliber rifles, has

28  explosives and counter-surveillance equipment.  Informant Four

1   was told by Defendant that Defendant will use deadly force if law

2   enforcement attempts to take action against Defendant.  Defendant

3   told Informant Four that Defendant is using his inheritance of

4   approximately two million dollars to purchase firearms, possibly

5   explosives, survivalist equipment and other items to prepare for

6   attack by law enforcement or the U.S. or foreign governments.

7   At least three of the informants stated that Defendant hides

8   firearms at or near his residence to avoid detection.

9      The affidavit further included description of the vehicle

10   stop, impound and inventory of the vehicle and recovery of a

11   fully automatic sten gun.  However, even excising, *arguendo*, the

12   vehicle search and seizure, the affidavit is sufficient to

13   establish probable cause to search Defendant's residence.  The

14   information about the seized machine gun is itself independently

15   sufficient to establish probable cause for search of the

16   residence.

17      Although Defendant has standing to object to the search and

18   seizure at his residence, at 42176 Indian Oak Road, Caliente, CA

19   93518, the affidavit, with or without the vehicle stop and seized

20   machine gun, provides probable cause for the issuance of the

21   search warrant for Defendant's residence.  The search and

22   seizures pursuant to a valid warrant are here lawful.

23   *///*

24   *///*

25   *///*

26   *///*

27   *///*

28   *///*

1

## CONCLUSION

2      For all the reasons stated above, Defendant's motions to

3 suppress are DENIED.

4

5 IT IS SO ORDERED.

6 Dated:    **March 18, 2008**                    **/s/ Oliver W. Wanger**
                                         UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**24**